**Joseph W. HENKLE, Sr., Plaintiff,**

v.

**Alan B. CAMPBELL, Chairman of the United States Civil Service Commission, Jule Sugarman, Vice-Chairman of the Commission, Ersa H. Poston, member of the Commission, in their official capacity as members of the United States Civil Service Commission and the United States Postal Service, Defendants.**

Civ. A. No. 78–1092.

United States District Court,
D. Kansas.

Dec. 13, 1978.

Michael S. Holland, Holland & Rupe, Russell, Kan., for plaintiff.

Jon K. Sargent, Asst. U. S. Atty., Wichita, Kan., for defendants.

## MEMORANDUM AND ORDER

WESLEY E. BROWN, District Judge.

The matter is before the Court on defendants' motion for summary judgment. In a Memorandum and Order, November 13, 1978, the Court set the motion for oral argument. All briefs have been filed, oral argument was had November 20, 1978, and the Court is prepared to rule on the motion. For reasons stated herein, we grant defendants' motion for summary judgment.

Plaintiff, a veteran, seeks reinstatement to his position as Postmaster of Great Bend, Kansas. He was appointed acting Postmaster of Great Bend March 12, 1965, converted to Career Postmaster March 8, 1967, and

served in such capacity until his termination effective March 18, 1977. By letter dated February 15, 1977, Wilbur L. Baird, Sectional Center Manager Postmaster, Wichita, Kansas, notified plaintiff of the Postal Service's proposal and reasons therefor to remove plaintiff from his employment with the United States Postal Service and from his position as Postmaster of Great Bend. Plaintiff responded by letter dated February 24, 1977, addressed to W. R. Roberts, District Manager, United States Postal Service, Wichita, Kansas. By letter dated March 15, 1977, Roberts advised plaintiff that the charges set forth in Baird's February letter were supported by the evidence and warranted plaintiff's removal as Postmaster, effective March 18, 1977. Plaintiff appealed this decision of removal to the United States Civil Service Commission. A hearing was had before the Commission May 24, 1977, and plaintiff's appeal for reinstatement was denied by decision dated February 14, 1978. This denial constitutes final agency action.

■ Plaintiff filed this action challenging his termination on March 9, 1978. In the November 13, 1978 Order, we dismissed certain of plaintiff's jurisdictional grounds, and dismissed the United States Civil Service Commission as a non-suable entity. We set out the standards of review of an adverse personnel action against federal civil service employees in the November 13 Order. These standards may be summarized as follows: The review by a federal court of adverse personnel action against federal civil service employees is necessarily limited, courts becoming involved only insofar as necessary to assure that the action challenged was neither arbitrary nor capricious, was reached in conformity with proper procedures, and was otherwise within the law. *Hurley v. United States,* 575 F.2d 792 (10th Cir. 1978); *Doe v. Hampton,* 184 U.S. App.D.C. 373, 566 F.2d 265 (1977). When reviewing an administrative decision under the arbitrary and capricious standard, a court's inquiry is limited to assuring that consideration has been given to all relevant decisional factors and that no clear error of judgment has been made. *Sabin v. Butz,*

515 F.2d 1061 (10th Cir. 1975). The standard does not require that an agency's decision be supported by substantial evidence but only that it have a rational basis in law. *Hurley v. United States, supra; Sabin v. Butz, supra.* The certified record of appeal and hearing transcript are a part of the file. There is no contention by either party that there are any factual issues outside the certified record. Since the parties are not entitled to a *de novo* hearing of this agency action, summary judgment may therefore be granted on the file and the certified record and hearing transcript. *See e. g. Doe v. Hampton, supra.* The record here provides ample evidence of a proper basis for plaintiff's removal.

Some of plaintiff's complaints are directed to the procedural aspects of his termination. He is, as he asserts, entitled to have the agency follow the procedures which have been established for such actions. He points to *Union of Concerned Scientists v. Atomic Energy Commission,* 163 U.S.App. D.C. 64, 499 F.2d 1069 (1974) for the "well-settled rule that an agency's failure to follow its own regulations is fatal to the deviant action." 163 U.S.App.D.C. at 77, 499 F.2d at 1082, citing *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957). A review of the record, however, indicates that the agency did not fail to follow its own regulations, nor any applicable statute or regulation.

5 U.S.C. § 7512 provides:

(a) An Agency may take adverse action against a preference eligible employee . . . only for such cause as will promote the efficiency of the service.

(b) A preference eligible employee against whom adverse action is proposed is entitled to—

(1) at least 30 days' advance written notice except when there is reasonable cause to believe him guilty of a crime for which a sentence of imprisonment can be imposed, stating any and all reasons, specifically and in detail, for the proposed action;

(2) a reasonable time for answering the notice personally and in writing and for furnishing affidavits in support of the answer; and

(3) a notice of an adverse decision.

\* \* \* \* \* \*

The appropriate definitions contained in 5 U.S.C. § 7511 indicate that a "preference eligible employee" includes a permanent or indefinite preference eligible who has completed a probationary or trial period as an employee of an Executive agency, while "adverse action" means a removal, suspension for more than 30 days, furlough without pay, or reduction in rank or pay. Plaintiff is entitled to treatment under 5 U.S.C. § 7512, therefore. Applicable regulations are found at 5 C.F.R. Part 752.

*1. Plaintiff had the appropriate 30 days' notice of adverse action.*

■ Plaintiff received a notice of proposed removal from Wilbur L. Baird on February 16, 1977. February 17, 1977, is, therefore, the first day to be counted toward fulfillment of the 30 days' notice period. The decision letter of William R. Roberts informed plaintiff that his termination would be effective March 18, 1977. March 18, 1977 is the thirtieth day after February 17. Plaintiff asserts that his termination was effective at 8:00 a. m. on March 18 and that he only had 29 days' notice. We disagree. As the United States Civil Service Commission Federal Employee Appeals Authority [FEAA] pointed out,

Federal Personnel Manual Supplement (FPM Supp.) 752–1, Section S5–2C, entitled "Effective Time for Removals," specifically provides that: "Removals become effective at 12 midnight on the date specified in the notice of decision, unless some other particular time is stated by the agency." Appellant has adduced no evidence showing that an earlier effective time was actually applied in the instant case. (Tr. 3).[1]

Plaintiff points out that Mr. Roberts testified that he presumed the time of termina-

tion would be 8:00 a. m. (H.T. 187, 188). We think Mr. Roberts' presumptions about the time do not stand up in the face of FPM Supp. 752–1, Section S5–2C, and that the time of termination would be 12 P.M., March 18, affording plaintiff 30 days' notice. We note in this connection that plaintiff received a full day's pay for the workday March 18 (H.T. 300). We hold that the notice provision was complied with by defendants.

*2. Wilbur Baird's communications with William Roberts about plaintiff's termination did not deprive plaintiff of due process, and did not violate termination procedures.*

■ 5 C.F.R. § 752.202, *Notice of adverse decision,* provides that "[t]he decision shall be made by a higher level official of the agency, when that exists, than the official who proposed the adverse action." Plaintiff argues that the proposed adverse action was discussed between Baird and Roberts before Baird issued the notice of proposed removal. A memorandum from Baird to Roberts, January 3, 1977 (Tr. 119) transmitted summaries of conversations with Great Bend Post Office staff and others, and also stated:

As you will note by the attached, Mr. Henkle refused to follow my instructions regarding training at another post office. He also stated he has in the past and will continue to call the Police Chief obscene names to his face.

I would consider Mr. Henkle unwilling to take direction, resentful of authority, feels no one has the authority to direct him, and his political connections make him untouchable by any representative of the Postal Service. In the past year I have visited with other citizens of Great Bend in addition to the Chief of Police and am of the opinion immediate action should be taken to relieve Mr. Henkle from postal responsibilities. It is my recommendation that he be placed on administrative leave effective January 4, 1977

---

1. H.T. refers to Part II of the certified record, the Hearing Transcript. Tr. refers to Part I of the certified record, the transcript of documents and agency records.

and a fitness for duty examination ordered.

Plaintiff was placed on administrative leave, and Roberts ordered an investigation of his activities. (Tr. 118). Baird testified that the purpose of this memorandum was to keep his superior officer, Mr. Roberts, apprised of the situation. We find that this communication was not a communication about the adverse action at issue here, i. e., Henkle's termination, since it was at an earlier time and was concerned with administrative leave. Baird also testified that at the later period, when he had prepared the letter notifying Henkle of the proposed termination, he discussed it with Lew Taylor, the Acting Director of Employee and Labor Relations, and with Mr. Roberts (H.T. 80). He stated that in discussing the matter with Mr. Roberts, he was "keeping the next level of management informed of the action that I was taking. . . . I was attempting to remove Mr. Henkle from office and I was keeping others informed as to what I was doing." (H.T. 80). Mr. Roberts stated that although he knew of the termination letter before it was issued, he did not tell Mr. Baird to issue it, nor did Baird seek his permission to issue it (H.T. 148–150). The FEAA found:

> The foregoing will not support a finding that Mr. Roberts was the *de facto* proposing official as well as the decision maker in this action. Rather, Mr. Baird was the responsible official who actually directed the agency's action in the proposal stage of the action under review. Therefore, the proposal was made by a lower organizational level than the level which made the final decision, and we find no violation of the regulatory provision quoted above. (Tr. 2–3).

We agree that the two-stage decision making procedure set out in the regulation was properly complied with. Nor do we find a violation of due process in the communication between Baird and Roberts. At this level of the termination proceedings, decisions are made by individuals not acting in adversary proceedings. This may be contrasted with the right of appeal as provided by the Civil Service regulations 5 C.F.R.

Part 752, where the proceedings would be adversarial and plaintiff would be entitled to a neutral decision-maker who had not received ex parte communications. There is no indication in the file that ex parte communications were made by any party at the appellate level. There was therefore no violation of due process or procedural rules in communications between Baird and Roberts.

3. *Plaintiff was not denied the opportunity to cross-examine witnesses.*

As noted above, an investigation was ordered by Roberts of plaintiff's activities. This investigation was carried out. Postal inspectors D. L. DeLaney and C. M. Macho, in a memorandum dated January 18, 1977, transmitted an Investigative Memorandum and exhibits to William Roberts (Tr. 53). The report (Tr. 54–117) includes reports from persons knowledgeable about the events referred to in the letter of proposed termination (Messrs. Baird, Barton and Cation) as well as reports from postal employees and other persons about matters which were not made the basis of plaintiff's termination. Messrs. Baird, Barton, and Cation were present and testified at the hearing of plaintiff's appeal. However, although plaintiff requested that the Postal Service produce the other persons as witnesses, the Hearing Officer refused this request. (Tr. 17). Plaintiff now complains that defendants were arbitrary and capricious in refusing "to permit plaintiff to call as witnesses H. R. Salmons, Kelvin R. Shull, Lawrence D. Gibson, Robert J. Uplinger, Jr., John A. Richardson, Ms. Janet Smith, Judy A. Nolte and Christine E. Bliss, yet permitting defendants' employees at the May 24, 1977 hearing to testify as to statements made by the above requested witnesses and considering their affidavits denying plaintiff the right to cross-examination." (Complaint, dkt. 1).

The Court has read the transcript of the May 24, 1977 hearing and fails to find specific testimony about statements made by these persons, although the investigative report was mentioned. The statements

made by these persons as a part of the investigation were not used as a basis of the charges brought against plaintiff. It was the actual charges, not other investigation, that were the subject of the hearing. Nor does the Court find any evidence that the statements or affidavits of these persons were considered in the termination of plaintiff. We agree with the FEAA, which stated:

. . . The [investigative] report contains a number of uncorroborated charges against appellant concerning matters which were not included in the notice of proposed removal. However, the record contains no evidence that any of the allegations mentioned in the Inspectors' report, but not in the letter of charges, was actually a factor in the decision to remove appellant. It is also noted that the charges relied upon by the agency in taking the action are not so insubstantial as to suggest that an employee would not be removed for those reasons alone. Therefore, the record reveals no basis for a finding that reasons other than those identified in the notice letter were factors in the decision to remove appellant. (Tr. 2).

Although there was testimony about the altercation between plaintiff and the Police Chief H. R. Salmons, this altercation was not the basis of Charge 1A; the basis of Charge 1A, as discussed *infra*, was plaintiff's subsequent refusal to accept and/or follow his superior's directive. Furthermore, had plaintiff wished Salmons, who was not a postal employee, to appear and testify, it was his responsibility to produce Salmons. 5 C.F.R. § 772.307(c); *DeLong v. Hampton*, 422 F.2d 21, 24 (3rd Cir. 1970); *Bishop v. McKee*, 400 F.2d 87 (10th Cir. 1968).

The notice letter (Tr. 44–46) states in pertinent part:

Proposed Notice of Adverse Action

This is advance written notice that it is proposed to remove you from the U.S. Postal Service no sooner than 30 days from the date of your receipt of this letter. This action is based on the following charges:

Charge # 1 Refusal to Accept and/or follow the Directives of your Superiors

A. On or about December 30, 1976, the undersigned accompanied by Messrs. Loren Barton, Lewis Taylor and Wesco Cation of the Wichita KS Post Office, visited the Great Bend Post Office for the purpose, in part, of resolving a customer service problem you were experiencing with Great Bend, KS Chief of Police H. R. Salmans. During the course of that discussion in your office and in the presence of Mr. Barton and Mr. Cation, I instructed you to refrain from referring to the local Police Chief as a "chicken shit, son of a bitch" and restrict your conversation with him to a professional level. In reply thereto, you stated, "Man, you are crazy. Nobody on earth can keep me from calling the Police Chief a chicken shit, son of a bitch. That's what he is; I've called him that before and I'll call him that again to his face." It is therefore evidence you failed to accept the directive of your superior.

B. On or about January 4, 1977, I sent you a registered letter (# 30385), directing you to report for a fitness for duty examination with Doctor Gary Keeny, Broadway Medical Center, 841 North Broadway, Wichita, KS, scheduled for 10:45 a. m., January 11, 1977. On or about the morning of January 10, 1977, you telephoned me to advise that you had no intention of taking the scheduled physical examination. On January 11, 1977, you did not report for the medical examination as directed.

In addition, the following elements of your past record will be considered in arriving at a decision if the charges are sustained:

1. On or about December 30, 1976, at the meeting convened in the office of the Great Bend, KS Post Office as set forth above, I told you that you were to receive training and would like it to start at the Coffeyville, KS Post Office

the following Monday, January 3, 1977. You replied "Why don't you grow up," requested the instruction in writing, and further stated in words or substance that you had absolutely no intention of going to Coffeyville or anywhere else. I then told you that I was ordering you to go to Coffeyville, KS Monday morning and you reiterated that you had no intention of going. On January 3, 1977, you did not report to Coffeyville Post Office as directed. On January 4, 1977, you received a registered letter of reprimand (# 30382) for failure to follow my verbal direction for training on January 3, 1977.

2. On January 3, 1977, when I became aware that you did not report as directed at Coffeyville, I notified or caused you to be notified by telephone to report to my office in the Wichita Post Office at 2:30 p. m. on that afternoon. You reported to my office at about 2:50 p. m. You attended the meeting for approximately three (3) minutes and then left my office, completely ignoring my requests and finally my direct order to remain until the meeting was over. For this conduct, I issued you a registered letter of reprimand (# 30383) on January 4, 1977 for your failure to remain for the duration of the meeting even after receiving a direct order to do so.

The letter, dated February 5, 1977, is from Baird.

*4. Charge 1A is not arbitrary or capricious, and has a rational basis.*

Plaintiff's challenges to Charge 1A are as follows: the verbal order given him by Baird regarding the Police Chief was misrepresented in Charge 1A; he was specifically instructed not to call the Police Chief a "chicken shit, son of a bitch" to his face, and he did not do so after being given this order, so there is no substantial evidence that he violated an order by his superior. The FEAA erred in ruling that a specific instance of misconduct was not necessary to support a charge that an employee refused to accept an order of his superior. His

First Amendment "freedom of mind" rights were violated by the order.

Plaintiff's brief cites a number of references by memorandum, affidavit, or testimony, to the verbal order given him by Baird regarding the Police Chief. The record contains the following:

Baird's January 14, 1977 Affidavit to the Postal Inspectors and memo of December 31, 1976 (Tr. 108, 126):

I then reminded Mr. Henkle that I was very concerned over the disagreement between the Police Department and the Postal Service and I thought it best that he restrict his conversations with the Police Chief to a more professional level and that he not refer to him as a "chicken shit, son-of-a-bitch." Mr. Henkle stated, "Man, you are crazy." "Nobody on earth can keep me from calling the Police Chief a chicken shit, son-of-a-bitch." "That's what he is; I've called him that before, and I'll call him that again, to his face!"

At this point I instructed Mr. Henkle not to call the Police Chief a chicken shit, son-of-a-bitch to his face. He stated that he had done it, that he "won't apologize for it."

Cross examination of Baird at the May 24, 1977 hearing:

(H.T. 115–119)

Q. Now in regards to the meeting of December the 30th, 1976, I'm a little confused over when you exactly gave the order to Mr. Henkle to refrain from calling the Chief of Police a chicken-shift [sic] son-of-a-bitch. Now did you—was this order directed to his language that he was to use with you during your conversations with him?

A. Oh, no. That was where he would not talk to the Chief of Police in that terminology.

Q. In other words, the order or Charge 1(a) has nothing to do with your conversation between you and Mr. Henkle, is that correct?

A. It's the result of my conversation with him.

Q. I know it is the result of it but you're not charging Mr. Henkle or you weren't telling Mr. Henkle: "Don't use that language in front of me here today"?

A. I am telling him not to use that language when referring to the Chief of Police, period.

Q. Period. In other words, he couldn't express his opinion in front of you as to what he thought of the Chief of Police?

A. He could express his opinion to me.

Q. Well, I'm very confused. I want to know exactly what Charge 1(a) is. Is the charge against Mr. Henkle in regard to Charge 1(a) that he violated your order not to use the term "chicken-shit son-of-a-bitch" in front of you?

A. I ordered him not to use that terminology with reference to the Police Chief. He instructed me—he told me that he would. He had before, he'd called him that to his face and he'd do it again.

Q. So you're saying—

A. I ordered him not to call the Chief of Police a chicken-shift [sic] son-of-a-bitch.

Q. To his face? Wasn't that in the order, to his face?

A. That is correct.

Q. So the order was, and I'll quote your statement from your memorandum and also it's in your affidavit, that the order was: "I instructed Mr. Henkle to not call the Police Chief a chicken-shit son-of-a-bitch to his face." Now that is the order, is it not?

A. That is—that is correct.

\* \* \* \* \* \*

Q. Mr. Baird, I refer you to your affidavit taken January the 14th, 1977, between Postal Inspector—before Postal Inspector C.M. M-a-c-h-o and Mr. D. L. Delaney, and I quote therefrom: "At this point I instructed Mr. Henkle not to call the Police Chief a chicken-shit son-of-a-bitch to his face."

A. May I see that.

A. This is correct. There was once that I told him not to refer to him as that. And then when I gave him the specific order, I ordered him not to call him that to his face.

Q. And that order is what we're here today on. is that right?

A. That's correct.

Q. Not to call him that to his face?

A. Right.

Q. O.K. So we're here today on your order to Mr. Henkle not to call the Chief of Police a chicken-shit son-of-a-bitch to his face, is that correct?

A. That's correct.

Q. Now please state the time, date and place subsequent to your order of December 31st, 1976, that Mr. Henkle called the Chief of Police of Great Bend, Kansas, a chicken-shit son-of-a-bitch to his face?

A. I don't know of any.

Q. You mean to tell me you know of no instances subsequent to the issuance of this order where Mr. Henkle has called— well, let me put it this way: Do you know of any instances subsequent to your order of December 31st, 197—or, excuse me, December 30th, 1976, where Mr. Henkle has even talked to the Chief of Police of the City of Great Bend, Kansas?

A. No.

Recross-examination of Loren A. Barton at the May 24, 1977 hearing:

(H.T. 32)

Q. But to your knowledge, you never heard Mr. Henkle call the Police Chief a chicken-shift [sic] son-of-a-bitch to his face, is that right?

A. I have never heard Mr. Henkle call the Police Chief a chicken-shift [sic] son-of-a-bitch to his face.

Q. And that was the order though, was it not?

A. That was the order.

Q. And when I quote this from your affidavit, "Mr. Baird ordered him not to call the Chief a chicken-shift [sic] son-of-a-bitch to his face," that was the full order, was it not?

A. That was the full order.

Further Redirect examination of Barton: (H.T. 33)

Q. Was that the only time that he told Mr. Henkle not to call the Police Chief that?

A. This conversation went on over a period of a minute or two. I think it started out that Mr. Baird said he didn't think he should call a professional person in that community by that term. And it went from there. Mr. Henkle seemed to decide that he was going to call him whatever he wanted to and that's where the argument started, if you want to call it an argument.

Q. Did Mr. Baird ever tell him to stop calling him by that term without the additional words to his face?

A. Yes, he told him not to call the Police Chief a son-of-a-bitch—a chicken-shift [sic] son-of-a-bitch. And I believe that Mr. Henkle replied that, as I recall, that he had called him that before and he'd call him that again. And at that point in time, Mr. Baird said, "I am ordering you not to call the Police Chief a chicken-shift [sic] son-of-a-bitch to his face."

Cross-examination of Barton: (H.T. 28–29)

Q. Am I correct though that the order then came later [after Mr. Cation arrived at the meeting] and the order was, and I quote, "Mr. Baird ordered him not to call the Chief a chicken-shit son-of-a-bitch to his face"?

A. That's as I remember it.

Q. And that is the full order?

A. As I remember it.

Q. Now can you please tell me the time, the date and the place that Mr. Henkle, after the December 30th, 1976 meeting, called the Great Bend Chief of Police a chicken-shit son-of-a-bitch to his face?

A. I have no knowledge of that.

Cross-examination of C. W. Cation: (H.T. 21)

Q. . . . Now to your personal knowledge, do you know the time, date and place that Mr. Henkle, after your meeting of December the 30th, 1976, called the Chief of Police a chicken-shit son-of-a-bitch?

A. When I walked out of that office at 4:00 or 4:30, whatever time the meeting was over, I've only spoken to Mr. Henkle once since then and I've only seen him once since then.

Q. So you're telling this tribunal here today that you don't know whether or not, since December the 30th, 1976, when this order was given, whether Mr. Henkle has called the Chief of Police a chicken-shit son-of-a-bitch or anything else?

A. I have no knowledge of that, no.

Cross-examination of William R. Roberts: (H.T. 173–177)

Q. Well, this goes back to the workings of your mind. I want to know is: Was he dismissed because of failing to allegedly follow an order or was he dismissed for profanity in violation of the Code of Ethics?

A. I would base mine on the fact that it was insubordination.

Q. And not the violation of the Code of Ethics with the use of profanity?

A. It's kind of hard to answer.

Q. Try.

\* \* \* \* \* \*

A. I'd say it was based on insubordination.

Q. Now specifically describe what insubordination it was based on? What did he do that was insubordinate?

A. The fact that he failed to heed Mr. Baird, that he should continue the use of that type of language to the Chief of Police.

Q. Well, to your knowledge, did he continue to use that type of knowledge (language) to the Chief of Police?

A. It's my understanding that he has. And here again, I'll have to go through the records, you know. I mean my understanding that he has—that he did continue.

Q. He did continue to use that type of language to the Chief of Police after December the 30th, 1976, is that your understanding of the facts in this case?

A. I'd have to say yes on that.

Q. Let me ask you this question: If evidence was introduced to show that he had not continued to use this type of language to the Chief of Police of Great Bend, Kansas, would your decision have been different?

A. I would have to take another look at it. It might come out the same but I would take another look at it.

Q. But that's the reason then you sustained Charge 1(a), if I understand your testimony, is because of the fact that subsequent to this order of Mr. Baird's on December the 30th, 1976, to Mr. Henkle, Mr. Henkle continued to use this type of language to the Chief of Police of Great Bend, Kansas? Does that basically set forth your reasoning for sustaining Charge 1(a)?

A. Yes.

We have set these portions of the Hearing Transcript out in detail because plaintiff argues strenuously that this evidence refutes Charge 1A. The Court cannot agree. The thrust of Charge 1A is the totality of circumstances surrounding the December 30, 1976, meeting and plaintiff's unwillingness to submit to the directives of his superior. As did the FEAA, we think it unimportant whether or not any final order was "Do not call the Police Chief a chicken-shit son-of-a-bitch to his face" or that plaintiff did not do so after the meeting. We agree with the FEAA that:

[I]t is the allegedly insubordinate character of appellant's response which is the conduct on which the specification is based. None of the various forms of the order which are suggested at various points in the record would alter the significance of the reply appellant is found to have made.

Appellant's representative also emphasis [sic] that the agency has not shown that appellant did, in fact, continue to refer to the Police Chief in the prohibited manner. However, we find that identification of a specific instance of the prohibited conduct is not necessary in order to support a charge that an employee refused to accept a directive of his supervisor. Appellant's announcement that he would continue the prohibited conduct if he so chose clearly constituted a refusal to accept the directive. (Tr. 4–5).

Nor do we think that plaintiff suffered any violation of First Amendment "freedom of mind" rights. Plaintiff cites *Speiser v. Randall*, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958) for the proposition that he, even as a government employee, is entitled to his opinion of a public official. We have no quarrel that plaintiff is entitled to his opinion. However, Charge 1A is not concerned with plaintiff's opinion, but how he chose to act in regard to that opinion. Specifically, he chose to slight a directive of his supervisor in an insubordinate manner. This was noted by the FEAA:

Appellant's testimony that his reply was merely an observation of the fact that he could not change his feelings about the Police Chief is self-serving and is contradicted by the testimony of each of the other four individuals who was present at the time the order in question was given. We, therefore, find that the preponderance of the evidence of record supports a finding that appellant's reply to Mr. Baird's order was essentially the same as the statement described in specification 1A and expressed the intention to continue with the prohibited conduct if he chose.

Plaintiff argues that the older "substantial evidence" test was not met because there was no substantial evidence that he disobeyed the specific order, i. e., that he called the Police Chief a chicken-shit son-of-a-bitch after being ordered not to do so. The substantial evidence test, *Vigil v. Post Office Department of United States*, 406 F.2d 921 (10th Cir. 1969), was subsequently declared by the Tenth Circuit as a too stringent standard in determining whether an agency's decision was arbitrary and capricious; the Court stated that all that was

required was that the decision have a rational basis in law. *Hurley v. United States, supra.* We disagree with plaintiff's contention about the foundation of Charge 1A, as noted above, feeling it to be insubordination and general disregard of his superior's directive. Under either a substantial evidence or a rational basis test, we feel that plaintiff was clearly insubordinate in regard to Baird's order about dealing with the Chief of Police.

In sum, we conclude that Charge 1A was neither arbitrary nor capricious, and had a rational basis in law.

*5. Charge 1B is not arbitrary or capricious, and has a rational basis in law.*

■ Plaintiff's challenges to Charge 1B are that Baird had no authority to order him to have a fitness for duty examination and that therefore he had a right to refuse to take the examination, and also that the Postal Manual does not authorize termination for only one refusal to take the examination.

The FEAA noted that "[w]hile hearing testimony would support a finding that Mr. Baird did have the actual authority to direct a Postmaster to undergo a fitness-for-duty examination, the material provided appellant is ambiguous on that point." (Tr. 5). The Court has reviewed the Hearing Transcript, and agrees that the evidence is ambiguous as to Baird's actual authority under the regulations. Henkle was sent a copy of a September 10, 1970 Postal Bulletin, as per his request, which stated:

The following instructions supercede Postal Manual 714.333 and establish the current authority and instructions for fitness for duty examinations. The Postal Manual will be amended accordingly.

 \* \* \* \* \* \*

*b.* Authority for Medical Examination

Appointing Officers may authorize examinations of their employees when required for above reasons. Regional Directors may require examinations for postmasters. . . . (Tr. 48).

However, it does not appear from the record that the Postal Manual was amended in accordance with this Bulletin. Though the record contains a 1975 Transmittal Letter that apparently accompanied a complete revision of the Postal Manual, Personnel Handbook, Series P–11 (H.T. 267), the record does not contain the pertinent part of that Revised Manual dealing with fitness for duty examinations. However, that Letter stated that it replaced all interim instructions. Also, Henkle's testimony at the hearing was that Postal Bulletins were effective for only six months. It would appear, then, that the Postal Bulletin sent to him was not in effect at that time. We are aware that this Bulletin was sent by Baird as his basis of authority. However, it seems that the actual basis of authority would be the version of 714.333(e) appearing in the 1969 Postal Manual, which was never amended (H.T. 5), attached to plaintiff's brief, dkt. 15. This provides:

*e. Authority for Examination*

The Regional Director, or officer authorized by him to act in his behalf, shall approve in advance the holding of any fitness for duty medical examination.

The thrust of plaintiff's argument is that Baird was not a Regional Director, nor was he an officer authorized by a Regional Director, because after the 1971 reorganization of the Postal Service, Regional offices and Regional Directors ceased to exist. He asserts that it is not his fault that the regulations weren't amended accordingly, and that the regulations are still applicable even though there is no officer with the title Regional Director who could order him to take an examination. The testimony of Baird and Roberts was that the new structure has Postmasters reporting to the Sectional Center rather than to the Regional Director, that Baird was the Manager of the Sectional Center, and that as such had authority to order Henkle to take a fitness for duty examination. Roberts also testified that he had delegated any authority required to Baird (H.T. 144–145).

This Court would agree with defendants that the change in structure makes a difference, and that Baird's job function would

include the old Regional Director's authority to instruct Postmasters to report for fitness-for-duty examinations. However, as did the FEAA, we think it unnecessary to decide this issue in light of the actual sequence of events surrounding Henkle's refusal to take the examination. The letter from Baird ordering the examination was dated January 4, 1977, and ordered Henkle to report for the examination on January 11, 1977. (Tr. 50). Henkle called Baird on January 10, 1977, and requested that Baird provide his authorization for ordering the physical. He testified that he did so on the advice of his attorney: (H.T. 211)

Q. O.K. What was said now, Mr. Henkle?

A. Well, I asked him [Baird] for his— that my counselor had told me he wanted the authorization that he had—I think it was for both putting me on administrative leave and the bringing me to Wichita for a physical. And he said, "Oh, you're not coming in the [sic]?" And I said, "No, Mr. Baird, I'm not coming in now, not at this time."

\* \* \* \* \* \*

Q. And that's exactly what you said, "I'm not coming in now, at this time"?

A. Yes, sir. "Under my lawyer's advice, I will not be present for the physical Fitness for Duty Examination at this time." . . .

As the FEAA noted, plaintiff did not know the basis of Mr. Baird's authority when he refused to take the examination. It appears from his own testimony that he had already determined that he would not report for the examination. We agree with the FEAA's analysis:

Appellant's course of conduct is entirely inconsistent with his obligations as an employee. In this regard it should be noted that appellant was in an administrative leave status; that is, he was receiving full pay and benefits yet was not required to report to his work site or to perform any duties. This fact put him under a particular obligation to assist in the expeditious completion of the physical examination so that the question of his

ability to return to duty could be resolved. Yet appellant's request for information regarding Mr. Baird's authority was made at such a late time as to make it highly unlikely that the information would be received in time to allow appellant to keep the scheduled appointment with the doctor. Moreover, he announced during the telephone conversation in which he first made inquiries into the subject of authority that he did not intend to report to the scheduled examination. Therefore, we find that his decision not to report to the medical examination cannot reasonably be attributed to a dispute regarding Mr. Baird's authority to order that examination. (Tr. 6–7).

We find that plaintiff's refusal to report for the examination was insubordination. A similar conclusion was reached in *Yates v. Manale*, 377 F.2d 888 (5th Cir. 1967), *cert. den.* 390 U.S. 943, 88 S.Ct. 1037, 19 L.Ed.2d 1139. As plaintiff points out, *Yates* is not factually identical, since the employee continued to refuse to take the examination despite warnings that refusal could constitute insubordination. However, she challenged the agency's reasons for ordering the examination, as plaintiff here challenges the agency's authority. We read *Yates* as standing for the proposition that termination may be proper for insubordination alone, despite challenges to the examination.

Plaintiff also argues that section 342.4 of the Personnel Manual forbids his termination for a single instance of refusal to report for the examination. That provides:

Failure to report for a fitness for duty examination without acceptable reasons is just cause for disciplinary action. Repeated refusals will be grounds for separation.

The Court reads 342.4 as stating that a single refusal to report for the examination, standing alone, calls for less severe disciplinary action than termination. We are not faced here with a single refusal standing alone. We are confronted with a single refusal, coupled with other instances of in-

subordination. We do not read 342.4 as forbidding the Postal Service to consider other instances of insubordination and determining the appropriate disciplinary action on the totality of circumstances. As the Tenth Circuit noted, "[t]he remedy necessary to promote the efficiency of the civil service is a matter peculiarly and necessarily within the discretion of the Civil Service and cannot be disturbed on judicial review absent exceptional circumstances not here present." *Bishop v. McKee, supra.* In light of plaintiff's repeated insubordinate behavior, as noted in all charges against him, the remedy of termination was not inappropriate. Charge 1B is therefore sustained.

### 6. Plaintiff was not denied due process in the consideration of the two reprimands.

█ Plaintiff alleges that he was denied due process because the two reprimands dated January 4, 1977, were considered in his termination. His position is that consideration of these two reprimands did not satisfy the Commission criteria contained in FPM Supp. 752–1, Section S4–3(b)(1), that therefore he did not prepare to respond to the reprimands at the May 24, 1977, hearing, and thus he did not have an opportunity to answer and was thus denied due process. We disagree.

The two reprimands were listed in the Notice of Proposed Action as "elements of your past record [which] will be considered in arriving at a decision if the charges [1A and 1B] are sustained." We have already stated that the full 30 days' notice required by 5 U.S.C. § 7512 was met by the Notice of Proposed Action. Plaintiff's complaint that he lacked adequate advance notice is equally invalid to the reprimands as to the charges. The next question is whether plaintiff was afforded his right to have these reprimands set out "specifically and in detail" as required by 5 U.S.C. § 7512. The agency has set out standards for this determination in FPM Supplement 752–1. S4–3(b)(1), Special Situations, provides:

> When an employee has been subjected to disciplinary action for one or more past offenses and the agency uses his discipli-

nary record as part of the basis for a current adverse action against him, the specificity and detail required of the agency—and also the extent of review and consideration required of the Commission on appeal—depend on whether the past disciplinary action meets three criteria: First, the employee was informed of the action in writing; second, the employee was given an opportunity to dispute the action by having it reviewed, on its merits, by an authority different from the one that took the action; and third, the action was made a matter of record. The difference in treatment, depending on whether these criteria are or are not met, is as follows:

> (a) If all three of the above criteria are met, the "specifically and in detail" requirement is satisfied by the agency's setting forth the nature of the action, the date it was effected, and the offense for which it was administered.

> . . .

> (b) If all three of the above criteria are not met, the "specifically and in detail" requirement is not satisfied unless the agency sets forth the particulars of the offense for which the discipline was administered, in the same manner as it must set forth the particulars of an offense for which no discipline was administered. On appeal, the employee is entitled to have the past offense investigated, reviewed, and considered in the same manner as an offense for which no discipline was administered. In other words, there is no difference whatever in this case between the treatment of the past record element and the treatment of a current instance of wrongdoing.

(Ex. A. defendants' brief, dkt. 16).

It is apparent that subsection (b) rather than (a), is applicable, since the second of the "above criteria," that there be prior review of the action by a different authority, was not met as to the two reprimands. We find that subsection (b) was complied with. The reprimands were set out in the Notice of Proposed Action in the same man-

ner and with the same particulars as Charges 1A and 1B. The FEAA placed no limit on consideration of the facts underlying the two reprimands at the hearing. On the contrary, there was testimony about the two reprimands, both from witnesses at the meeting plaintiff walked out of, and from plaintiff. There is no indication that plaintiff was deprived of his entitlement to have the two reprimands reviewed on appeal. His own inability to present his position on the reprimands as fully as he might have desired, simply because he was convinced that only subsection (a) not subsection (b) was applicable, and because he was convinced that subsection (a) could not be met, cannot be the basis of a denial of due process by the defendants.

Plaintiff also asserts that the FEAA did not comply with its own ruling about how the reprimands could be used. The Hearing Transcript contains Hearing Examiner Freet's comments about how the reprimands were to be considered:

(H.T. 4)

. . . It has been determined, after reference to Federal Personnel Manual, Supplement 752–1, Subchapter 4–3(b)(1)(b), that this material—evidence concerning these charges will be accepted at today's hearing for the purpose of determining whether they were proper instances for the issuance of the Letter of Reprimand which was the prior disciplinary action taken.

Because of the dates of the current charges, the charges on which the removal action are premised, the past record, if found to be proper, will be considered only with respect to Charge 1(a) because the conduct mentioned in—my mistake—will be considered only with regard to Charge 1(b). The conduct mentioned in Charge 1(a) had occurred before the issuances of the prior disciplinary actions.

(H.T. 14)

As I said earlier, Mr. Holland, the prior discipline will be considered with regard to the severity of the penalty taken under Charge 1(b) if the prior disciplinary actions are shown to satisfy the Commission's criteria.

Thus, the FEAA's ruling was that it would use the reprimands, after full review at that hearing in accordance with the Commission's criteria as contained in subsection (b), and would apply them to the severity of discipline under Charge 1B. We have already said that plaintiff's entitlement to full review was granted. The FEAA gave full consideration to the facts underlying the two reprimands, and found the following:

[Reprimand # 1]

Appellant does not dispute that he was ordered by Mr. Baird to report to Coffeyville, Kansas, for training and that he never reported to the Coffeyville Post Office. Beyond expression of the opinion that he did not need training (HT 215–216), appellant has offered no reason for his failure to follow Mr. Baird's order and has suggested no basis for mitigation of the penalty chosen. Based on the foregoing, we find that appellant did engage in the conduct for which the reprimand was issued. We further find that the refusal to report for a training assignment is adequate grounds for the issuance of a reprimand.

[Reprimand # 2]

Appellant does not deny the conduct . . . and, in fact, specifically confirmed that he had disobeyed a specific order from Mr. Baird that he return to the meeting (HT 214–215). He contends that this conduct was justified because Mr. Roberts and Mr. Barton had also been present at the meeting. He had previously been advised by his attorney to "walk out" of any meeting in which he was outnumbered in this way by management officials because of the difficulty he would have corroborating his version of any problems which developed during the meeting (HT 215). (As was discussed above, the fact that appellant's conduct was on the advice of counsel does not affect the agency's right to discipline him for that conduct.) The only justification offered by appellant for his conduct is an unspecified portion of the union contract

which allegedly gives an employee the right to have any counseling given by his supervisor occur in private (HT 224–228). Appellant does not cite the section of the contract on which he relies nor does he explain how he, a member of management, would acquire rights granted to bargaining unit members under the contract. He merely states: "I don't know why it wouldn't pertain to me as well as it would to a man out on the floor" (HT 224). Based on the evidence reviewed above, I find that appellant has failed to shown [sic] that postal policy gave him the right to have such a meeting conducted privately between himself and his supervisor.

Moreover, any right appellant might have had to such a private meeting would have been waived by his failure to request such privacy. Both appellant's own testimony and that of Mr. Baird's show that appellant simply walked out of the meeting after being advised that Mr. Baird intended to place him on administrative leave. There is no evidence that he ever mentioned the fact that he considered the meeting to be improper because of the number of management officials in attendance; and he specifically testified that he never asked to have a representative present (HT 225).

Based on the foregoing, we find that appellant had engaged in the conduct which the January 4, 1977, reprimand was based and that a reprimand is not an unreasonably harsh penalty for such conduct.

The two sustained charges concern two instances of clear and willful refusal by appellant to accept reasonable supervisory instructions. The second of these is particularly significant because it closely followed two other instances in which the agency had attempted to deal with appellant's insubordinate behavior by taking less serious disciplinary actions. Based on the sustained charges of failure to accept supervisory instructions and on the past record which shows him to have been disciplined for similar conduct before the occurrence which gave rise to the second

charge, we find that the penalty of removal was justified. (Tr. 8–9)

We have set the foregoing out in its entirety to show that plaintiff received the full consideration of the reprimands to which he was entitled on appeal under FPM Supp. 752–1, S4–3(b)(1). This being so, the FEAA properly found that the reprimands could be used in connection with Charge 1B to determine the severity of the remedy. We cannot legally substitute our judgment for FEAA's determination that removal was justified.

7. *There was no error in the FEAA's determination that plaintiff's termination was for such cause as will promote the efficiency of the service.*

 The decision of the FEAA (Tr. 9) is as follows:

Based on the foregoing analysis, we find that the adverse action of the U. S. Postal Service in removing appellant from his position was not unreasonable, arbitrary, or capricious, but was for such cause as will promote the efficiency of the service within the meaning of Civil Service Regulation 752, Subpart B. Therefore, the agency action is affirmed.

Plaintiff makes two contentions as to this decision. First, he asserts that this is an amendment of the charges, and that he was denied 30 days' notice of this charge. Again we must disagree. The decision that plaintiff's termination is for such cause as will promote the efficiency of the service is not a charge. It is a conclusion, based on the affirmance of the charges brought against plaintiff. Second, he asserts that his termination was not for such cause as will promote the efficiency of the service. 5 U.S.C. § 7512(a) states that he may only be terminated for such cause as will promote the efficiency of the service. Numerous cases have held that insubordination is such cause as will promote the efficiency of the service. *Bishop v. McKee, supra; Studemeyer v. Macy,* 116 U.S.App.D.C. 120, 321 F.2d 386 (1963); *Miller v. United States,* 438 F.Supp. 514 (E.D.Penn.1977); *May v. United States Civil Service Commission,* 230

F.Supp. 659 (W.D.La.1963). Since we have held that the charges of insubordination were supported by the evidence before the FEAA, plaintiff's termination for that reason authorizes a finding by the agency that it promotes the efficiency of the service.

The FEAA's decision that plaintiff's termination was not unreasonable, arbitrary, or capricious, but was for such cause as will promote the efficiency of the service, must be affirmed.

IT IS THEREFORE ORDERED that defendants' motion for summary judgment be, and it is hereby Granted.